**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BECKLEY DIVISION**

REBECCA S. EPLING,                          )
                                            )
      **Plaintiff,**                          )
                                            )
**v.**                                      )          CIVIL ACTION NO. 5:06-00958
                                            )
MICHAEL J. ASTRUE,                          )
Commissioner of Social Security,            )
                                            )
      **Defendant.**                          )

**M E M O R A N D U M   O P I N I O N**

      This is an action seeking review of the decision of the Commissioner of Social Security

denying Plaintiff's application for Disability Insurance Benefits (DIB), under Title II of the Social

Security Act, 42 U.S.C. §§ 401-433. This case is presently pending before the Court on the parties'

cross-Motions for Judgment on the Pleadings. (Doc. Nos. 15 and 16.) Both parties have consented

in writing to a decision by the United States Magistrate Judge. (Doc. Nos. 2 and 3.)

      The Plaintiff, Rebecca S. Epling (hereinafter referred to as "Claimant"), filed an application

for DIB on September 8, 2003, alleging disability as of January 29, 2003, due to fibromyalgia,

fibromycitis, arthritis, pain in multiple joints, depression, and short-term memory loss, difficulty

remembering patients and duties, pain, sleepiness, weakness, pain in her hands and arms when

writing and typing, incontinence, stress, anxiety, irritable bowel syndrome, restless leg syndrome,

sleep apnea, and headaches. (Tr. at 19, 38, 45, 56-58, 68.) The claim was denied initially and on

reconsideration. (Tr. at 38-40, 45-47.) On March 29, 2004, Claimant requested a hearing before an

Administrative Law Judge (ALJ). (Tr. at 49.) The hearing was held on July 14, 2004, before the

Honorable John Murdock. (Tr. at 625-54.) By decision dated July 26, 2005, the ALJ determined that

Claimant was not entitled to benefits. (Tr. at 18-28.) The ALJ's decision became the final decision of the Commissioner on September 12, 2006, when the Appeals Council denied Claimant's request for review. (Tr. at 2, 8-11.) On November 10, 2006, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Doc. No. 1.)

Under 42 U.S.C. § 423(d)(5), a claimant for disability has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2006). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's

remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2006). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

> *(c) Rating the degree of functional limitation.* (1)Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
>
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.
>
> (3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).[1] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the

---

[1] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation , each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2).

In this particular case, the ALJ the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since her alleged onset date. (Tr. at 19.) Under the second inquiry, the ALJ found that Claimant suffered from fibromyalgia and sleep apnea, which were severe impairments. (Tr. at 19-23.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 23.) The ALJ then found that Claimant had a residual functional capacity for light work, as follows:

> [T]he claimant retains the residual functional capacity to perform the exertional and nonexertional requirements of work except for lifting and carrying more than 20 pounds occasionally and 10 pounds frequently; she requires an at will sit/stand option; she can never climb ladders, ropes, and scaffolds; and she needs to avoid all exposure to machinery and heights. A second hypothetical question was also proposed to the vocational expert, which restricted the claimant to a limited range of sedentary exertional work; she can never climb ladders, ropes, and scaffolds; and she needs to avoid all exposure to machinery and heights.

(Tr. at 24, 27 Finding 6.) At step four, the ALJ found that Claimant could not return to her past relevant work. (Tr. at 25.) On the basis of testimony of a Vocational Expert ("VE") taken at the administrative hearings, the ALJ concluded that Claimant could perform jobs such as a file clerk,

mail room clerk, and general clerk, at the light level of exertion, and as dispatcher, surveillance system monitor, and telephone solicitor/surveyor, at the sedentary level of exertion. (Tr. at 26.) On this basis, benefits were denied. (Tr. at 27-28.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was born on May 15, 1960, and was 45 years old at the time of the administrative hearing. (Tr. at 19, 25, 56, 628.) Claimant had a high school education and attended vocational training for a licensed practical nurse. (Tr. at 19, 74, 629.) In the past, she worked as a pharmacy clerk and cashier, desk clerk, and licensed practical nurse. (Tr. at 19, 69, 80-83, 642.)

6

The Medical Record

      The Court has reviewed all the evidence of record, including the medical evidence, and will discuss it below in relation to Claimant's arguments.

Claimant's Challenges to the Commissioner's Decision

      Claimant asserts that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in (1) finding that Claimant's depression did not meet Listing 12.04 and in considering Claimant's fibromyalgia under Listing 14.00 instead of 1.00; (2) not having a medical expert present at the administrative hearing; (3) assessing Claimant's pain and credibility; (4) applying the wrong standard in assessing Claimant's residual functional capacity ("RFC"); and (5) misconstrued the testimony of the VE. (Doc. No. 15 at 3-12.) The Commissioner asserts that Claimant's arguments are without merit and that substantial evidence supports the ALJ's decision. (Doc. No. 16 at 8-19.)

**1. Listing of Impairments.**

      **A. *Anxiety & Depression*.**

      Claimant first alleges that the ALJ erred in finding that her anxiety and depression did not meet Listing 12.04. (Doc. No. 15 at 5-7.) Regarding the "A" and "B" criteria of § 12.04, Claimant asserts that the medical records of Drs. Hasan and Saikali demonstrate that she meets these criteria. (Id. at 7.) Claimant notes that these records document a loss of interest in activities, weight gain, sleep disturbance, decreased energy, difficulty concentrating or thinking, and feelings of hopelessness or thoughts of suicide. (Id.) She asserts that these records further establish that she meets the "C" criteria by demonstrating that she was treated for depression for two years and that her depression "caused more than a minimal limitation of ability to do basic work activities, and symptoms and signs attenuated by medication and psychosocial treatment." (Id.)

The Commissioner asserts that Claimant does not address the "B" criteria and addresses only part of the "C" criteria, neglecting to mention that she must demonstrate the factors set forth in § 12.04(C)(1) - (3). (Doc. No. 16 at 12.) Consequently, Claimant has not demonstrated that her mental impairments were of sufficient severity to meet or equal the "B" or "C" criteria for Listing § 12.04. (Id. at 12-13.)

"The Listing of Impairments . . . describes, for each of the major body systems impairments that we consider to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience. 20 C.F.R. §§ 404.1525(a), 416.925(a) (2006); see Sullivan v. Zebley, 493 U.S. 521, 532, 110 S.Ct. 885, 891, 107 L.Ed.2d 967 (1990). "For a claimant to qualify for benefits by showing that h[er] unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment, [s]he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment." See id. at 531 (emphasis in original).

Section 12.04 of the Listing of Impairments covers Affective Disorders, and provides as follows:

> *Affective Disorders.* Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.
>     The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.
>     A.  Medically documented persistence, either continuous or intermittent, of one of the following:
>     1.  Depressive syndrome characterized by at least four of the following:
>     a.  Anhedonia or pervasive loss of interest in almost all activities; or
>     b.  Appetite disturbance with change in weight; or
>     c.  Sleep disturbance; or
>     d.  Psychomotor agitation or retardation; or
>     e.  Decreased energy; or
>     f.  Feelings of guilt or worthlessness; or
>     g.  Difficulty concentrating or thinking; or

  h.  Thoughts of suicide; or

  I.  Hallucinations, delusions, or paranoid thinking;

or

  2.  Manic syndrome characterized by at least three of the following:

  a.  Hyperactivity; or

  b.  Pressure of speech; or

  c.  Flight of ideas; or

  d.  Inflated self-esteem; or

  e.  Decreased need for sleep; or

  f.  Easy distractability; or

  g.  Involvement in activities that have a high probability of painful consequences which are not recognized; or

  h.  Hallucinations, delusions or paranoid thinking;

or

  3.  Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);

AND

  B.  Resulting in at least two of the following:

  1. Marked restriction of activities of daily living; or

  2. Marked difficulties in maintaining social functioning: or

  3. Marked difficulties in maintaining concentration, persistence, or pace; or

  4. Repeated episodes of decompensation, each of extended duration.

OR

  C.  Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

  1.  Repeated episodes of decompensation, each of extended duration; or

  2.  A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

  3.  Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P., App. 1 § 12.04 (2006).

  At steps two and three of the special technique, the ALJ found that Claimant's depressive and adjustment disorders were not severe impairments. (Tr. at 20-21.) The ALJ summarized the relevant medical evidence and assessed Claimant's impairments under the special technique. (Id.) Without

9

addressing whether Claimant met the "A" or "C" criteria of § 12.04, the ALJ went on to assess the "B" criteria. (Tr. at 20-21.) In assessing the "B" criteria, the ALJ found that Claimant had mild restriction of activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no evidence that Claimant had experienced any episodes of decompensation of extended duration. (Id.)

As noted above, the ALJ found that Claimant's mental impairments were not severe. Nevertheless, Claimant persists in arguing that the ALJ erred in not finding that her mental impairments met Listing § 12.04. Addressing the "C" criteria, Claimant asserts that she was treated for depression for two years and that her depression caused more than a minimal limitation of ability to do basic work activities, with symptoms and signs attenuated by medication and psychosocial treatment. (Doc. No. 15 at 7.) As the Commissioner notes however, Claimant does not address the requisite factors of § 12.04(c)(1) - (3), and the evidence of record does not demonstrate that she met these criteria. There is no indication that she suffered repeated episodes of decompensation or that she had a residual disease process that resulted in marginal adjustment for which a minimal increase in mental demands or change in environment would cause her to decompensate. Furthermore, there is no indication that she was unable to function outside a highly supportive living arrangement. Though Claimant's husband reminded her of appointments and to take her medication, these frequent reminders is not indicative of a highly supportive living arrangement contemplated under § 12.04(c)(3). Claimant therefore, has not demonstrated that she satisfied the "C" criteria.

Considering the "B" criteria, the Court finds that Claimant has not demonstrated that her mental conditions resulted in the requisite number of marked limitations in activities of daily living, social functioning, or concentration, persistence, or pace. Furthermore, the evidence does not indicate that her conditions resulted in repeated, or any, episodes of decompensation. The medical evidence

overall demonstrates that at most, her ability to maintain social functioning was moderately limited. (Tr. at 175-82, 183-87, 188-202, 275-79, 280-93.) However, the ALJ found that substantial evidence demonstrated that Claimant visited with family and friends, and went shopping and attended doctor appointments three to four times every two weeks. (Tr. at 21.) Though her treating psychiatrist, Dr. Hasan, assessed a GAF of 50, which is indicative of serious symptoms (Tr. at 253,), the ALJ found that Dr. Hasan did not find that Claimant had problems concentrating and that she reported that she visited with friends and relatives. (Tr. at 21.)

Claimant underwent a psychological evaluation on November 13, 2003, by Dale M. Rice, M.A. (Tr. at 175-82.) Claimant reported depressed mood, diminished interest in activities, difficulty concentrating, loss of appetite, feelings of worthlessness, and past suicidal thoughts. (Tr. at 175.) On mental status exam, Mr. Rice opined that her mood was depressed and affect was restricted, but noted that she had logical and coherent thought processes, no delusions or abnormal behaviors, fair insight, normal judgment, and denied suicidal or homicidal ideation. (Tr. at 177-78.) He opined that her immediate memory was mildly deficient as she recalled three out of four items, but that her recent and remote memory, as well as her concentration were within normal limits. (Tr. at 178.) He noted that she was able to perform serial threes. (Id.) Mr. Rice determined that Claimant was uninterested in psychological testing, lacked adequate motivation, gave up easily, required constant encouragement, worked at a slow pace. (Id.) He noted that her mood had a mild to moderate negative effect on her performance. (Id.) Mr. Rice diagnosed Depressive Disorder NOS and Anxiety Disorder NOS. (Id.) He determined that Claimant's daily activities included attempts to clean the house, doing laundry, lying down, feeding her cats, fixing dinner sometimes, and watching television. (Tr. at 180.) On a weekly basis Claimant went to the store, visited with her brother, and attended appointments with her husband. (Id.) On a monthly basis, Claimant reported that she paid the bills and visited her

11

father or sister. (Id.) Mr. Rice opined that Claimant's social functioning was moderately deficient, noting that she was responsive and fairly cooperative, exhibited fair eye contact, was uninterested in testing, and lacked adequate rapport. (Id.) He further opined that her persistence and pace were moderately deficient as she required little encouragement during the interview but constant encouragement during testing and worked at a slow pace during testing. (Id.) Her activities of daily living and concentration were determined to be within normal limits. (Id.) Finally, Mr. Rice opined that Claimant's prognosis was fair. (Id.)

State agency psychological consultants Debra Lilly, Ph.D. and Dr. James Binder, M.D., opined that Claimant had mild limitations of activities of daily living; moderate limitations in maintaining social functioning, concentration, persistence, and pace; and had no episodes of decompensation. (Tr. at 198, 290.) They each further opined that Claimant was moderately limited in her ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; and interact appropriately with the general public. (Tr. at 183-84, 275-76.) Additionally, Dr. Lilly opined that she was moderately limited in her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. (Tr. at 183.) Dr. Binder further opined that Claimant was moderately limited in her ability to carry out detailed instructions; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; and accept instructions and respond appropriately to criticism from supervisors. (Tr. at 275-76.)  and moderate limitations (Tr. at 183-87, 188-202, 275-79, 280-93.)

In a form "Activities of Daily Living," dated February 10, 2004, Claimant reported that family members assisted her in washing her hair and cutting her toe nails. (Tr. at 103.) She reported that her daughter primarily performed all the housework, (Tr. at 104.) Claimant indicated that she

spent one or two hours each week shopping for food and medication but that someone else drove. She reported that she watched television for three to four hours a day but did not enjoy it. (Tr. at 104.) Claimant indicated that she no longer sews, quilts, gardens, shops, or walks, all activities which she used to enjoy. (Tr. at 105.) She further indicated that she visits or receives visits from friends once every three to four months. (Tr. at 105.) On a form Reconsideration Disability Report, dated January 25, 2004, Claimant indicated that she experienced pain which prevented her from bending to shave her legs and cut her toenails, and that she had difficulty getting in and out of the bathtub and washing her hair. (Tr. at 100.)

Regarding the "B" criteria, the undersigned therefore finds that the ALJ's determination at steps two and three of the special technique is supported by substantial evidence. The evidence of record does not indicate that Claimant had any marked restrictions which would satisfy the "B" criteria. Accordingly, the Court finds that Claimant has not demonstrated that she met Listing § 12.04, and further finds that the ALJ's decision is supported by substantial evidence.

### B. *Fibromyalgia*.

Claimant also alleges that the ALJ erred in evaluating Claimant's fibromyalgia under Listing § 14.09 instead of Listing § 1.02, which she claims she met. (Doc. No. 15 at 7-9.) Pursuant to § 1.02, Claimant asserts that the evidence of record indicates that she suffers from chronic joint pain and stiffness in her hands and fee, a bony dyesthesias, and that these impairments affect the major weight bearing peripheral joints listed in § 1.02, including the knees. (Id. at 9.) She further asserts that the "ongoing and constant suffering the impairment has caused" her is reflected in the treatment notes of Dr. Wassim Saikali and Dr. John Byrd. (Id.) The Commissioner asserts that both Listings §§ 14.09 and 1.02 require the same criteria. (Doc. No. 16 at 9-12.) Specifically, he notes that the ALJ determined Claimant did not meet § 14.09 because "there was no evidence of 'inability to ambulate

effectively of [sic] inability to perform fine and gross movements effectively.'" (Id. at 10.) Furthermore, the Commissioner asserts that the medical evidence demonstrates that Claimant did not meet the criteria of either listing regarding ambulation or fine and gross manipulation. (Id. at 10-11.) The Commissioner therefore contends that the ALJ's finding that Claimant's "fibromyalgia did not meet or equal a listed impairment, regardless of which listing is considered, is supported by substantial evidence and should be affirmed." (Id. at 11-12.)

 As Claimant notes, the ALJ evaluated her fibromyalgia under § 14.09 (immune system), and determined that the evidence did not demonstrate a "history of joint pain, swelling, and tenderness, and signs on current physical examination of joint inflammation or deformity in two or more major joints resulting in inability to ambulate effectively o[r] inability to perform fine and gross movements effectively." (Tr. at 22-23.)

 Section 14.09 of the Listing of Impairments covers Inflammatory Arthritis, and provides as follows:

> *Inflammatory Arthritis*. Documented as described in 14.00B6, with one of the following:
> A. History of joint pain, swelling, and tenderness, and signs on current physical examination of joint inflammation or deformity in two or more major joints resulting in inability to ambulate effectively or inability to perform fine and gross movements effectively, as defined in 14.00B6b and 1.00B2b and B2c; or
> B. Ankylosing, spondylitis or other spondyloarthropathy, with diagnosis established by findings of unilateral or bilateral sacroiliitis (e.g., erosions or fusions), shown by appropriate medically acceptable imaging, with both:
> 1. History of back pain, tenderness, and stiffness,
> and
> 2. Findings on physical examination of ankylosis (fixation) of the dorsolumar or cervical spine at 45 or more of flexion measured from the vertical position (zero degrees);
> or
> C. An impairment as described under the criteria in 14.02A.
> or
> D. Inflammatory arthritis, with signs of peripheral joint inflammation on current examination, but with lesser joint involvement than in A and lesser extra-

14

articular features than in C, and:

  1. Significant, documented constitutional symptoms and signs (e.g., fatigue, fever, malaise, weight loss), and

  2. Involvement of two or more organs/body systems (see 14.00B6d). At least one of the organs/body systems must be involved to at least a moderate level of severity.

or

  E. Inflammatory spondylitis or other inflammatory spondyloarthropathies, with lesser deformity than in B and lesser extra-articular features than in C, with signs of unilateral or bilateral sacroiliitis on appropriate medically acceptable imaging; and with the extra-articular features described in 14.09D.


or

  2. Manic syndrome characterized by at least three of the following:
  a. Hyperactivity; or
  b. Pressure of speech; or
  c. Flight of ideas; or
  d. Inflated self-esteem

20 C.F.R. Pt. 404, Subpt. P., App. 1 § 14.09 (2006). Similarly, § 14.09 of the Listing of Impairments

covers Major Dysfunction of a joint due to any cause, and provides as follows:

 *1.02 Major dysfunction of a joint(s) (due to any cause)*: Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:

  A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b; or

  B. Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

20 C.F.R. Pt. 404, Subpt. P., App. 1 § 1.02 (2006).

 As the Commissioner notes, § 14.09 requires essentially the same criteria, though perhaps a

bit more restrictive, than § 1.02. Accordingly, to the extent that the ALJ may have committed error

in not considering Claimant's fibromyalgia under § 1.02, the Court finds that any such error is

harmless. Considering Claimant's fibromyalgia under either Listing, the Court finds that the ALJ's

decision is supported by substantial evidence of record. Both Listing require the inability to ambulate effectively or the inability to perform fine and gross movements effectively.

The Court first addresses Claimant's ability to ambulate effectively. The Regulations define generally the inability to ambulate effectively as "having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." 20 C.F.R. Pt. 404, Subpt. P., App. 1 § 1.00(B)(2)(b)(1) (2006). The medical evidence reveals that on April 1, 2004, Dr. Mark Shaffrey, M.D., observed on physical exam that Claimant presented with a "mildly antalgic" gait. (Tr. at 575.) Dr. Shaffrey noted that her muscle strength was normal, as were her deep tendon reflexes. (Id.) On July 1, 2004, Dr. Shaffrey noted that Claimant was "somewhat unsteady on her feet" and that she could heel and toe walk, "but only weakly." (Tr. at 578.) Two months later, however, on September 15, 2004, Dr. Rodolfo Gobunsuy, M.D., observed on physical exam that Claimant presented with a steady gait and had no difficulty arising from a sitting position. (Tr. at 349.) On neurological exam, Dr. Gobunsuy observed no muscle weakness or atrophy and noted that sensation was normal to light touch and pin-prick. (Tr. at 350.) Claimant was able to walk on her heels and toes and could walk heel-to-toe and squat, but with difficulty. (Id.) There is no indication in the record that Claimant used an assistive device on a consistent basis to ambulate. The ALJ noted Dr. Gobunsuy's findings (Tr. at 22.) and determined that Claimant did not meet the criteria of an inability to ambulate effectively. Claimant does not identify specifically, how she is unable to ambulate effectively. Accordingly, after reviewing the evidence of record, the Court finds that the ALJ's decision is supported by substantial evidence.

The Court next considers Claimant's ability to perform fine and gross manipulation. The Regulations define the inability to perform fine or gross manipulation as "an extreme loss of function of both upper extremities, i.e., an impairment(s) that interferes very seriously with the individual's

16

ability to independently initiate, sustain, or complete activities." 20 C.F.R. Pt. 404, Subpt. P., App. 1 § 1.00(B)(2)(c) (2006). The Regulations further indicate that to use upper extremities effectively, "individuals must be capable of sustaining such functions as reaching, pushing, pulling, grasping, and fingering to be able to carry out activities of daily living." Id. Examples of ineffective ability to perform fine and gross movements include, "the inability to prepare a simple meal and feed onseself, the inability to take care of personal hygiene, the inability to sort and handle papers or files, and the inability to place files in a file cabinet at or above waist level." Id.

As stated above, the ALJ determined that the evidence of record did not demonstrate that Claimant had an "inability to perform fine and gross movements." (Tr. at 23.) The Court finds that the ALJ's decision is supported by substantial evidence. In a form Activities of Daily Living, dated September 22, 2003, Claimant reported that she prepares simple meals; performs basic household chores such as laundry, vacuuming, dusting, mopping floors, and washing dishes, with some assistance; and that she pays the bills, which would encompass sorting and handling papers. (Tr. at 88.) Furthermore, though Claimant reported that she required assistance with washing and bathing, she is able to dress and shave herself. (Tr. at 87.) The medical evidence demonstrates that on September 15, 2004, Dr. Gobunsuy observed Claimant write her name and pick up a coin with the right hand, without difficulty. (Tr. at 350.) Dr. Shaffrey noted on April 1, 2004, that Claimant's strength was normal. (Tr. at 575.) The Court finds, based on Claimant's reported activities and the absence of compelling medical evidence, that Claimant has not demonstrated that she has the inability to perform fine and gross manipulation, such as to meet either Listing § 1.02 or § 14.09. Accordingly, the ALJ's decision that Claimant's fibromyalgia does not meet a Listing impairment is supported by substantial evidence of record.

**2. Pain and Credibility.**

17

Claimant next alleges that the ALJ improperly considered the medical records and applied the incorrect standard of law in finding that Claimant was partially credible regarding the intensity of her pain and other symptoms. (Doc. No. 15 at 10-11.) She asserts that the ALJ irrationally reasoned that Claimant was partially incredible because she did not perform the exercises as instructed by Dr. Saikali to alleviate pain, when she was unable to do the exercises due to the pain. (Id. at 10.) Additionally, she asserts that her severe depression hindered the treatment of her fibromyalgia. (Id.) Claimant further alleges that though the record establishes that she experienced multiple side effects from her prescription medications, the ALJ improperly found that Claimant's medications would not interfere with performing the jobs identified by the VE. (Id. at 11.)

The Commissioner asserts that the ALJ considered all the objective medical evidence of record and that his assessment of Claimant's subjective complaints is supported by the opinions of Drs. Egnor, Lilly, Binder, and Lambrechts. (Doc. No. 16 at 15.) Regarding Claimant's alleged side effects, the Commissioner asserts that "[w]hile treating and examining physicians have reported some tiredness related to Plaintiff's medications, there is no support in the record for her allegation that she would be unable to stay awake at work." (Id. at 19.)

A two-step process is used to determine whether a claimant is disabled by pain or other symptoms. First, objective medical evidence must show the existence of a medical impairment that reasonably could be expected to produce the pain or symptoms alleged. 20 C.F.R. §§ 404.1529(b) and 416.929(b) (2006); SSR 96-7p; See also, Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996). If such an impairment is established, then the intensity and persistence of the pain or symptoms and the extent to which they affect a claimant's ability to work must be evaluated. Id. at 595. When a claimant proves the existence of a medical condition that could cause the alleged pain or symptoms, "the claimant's  subjective complaints [of pain] must be considered by the Secretary, and these

complaints may not be rejected merely because the severity of pain cannot be proved by objective medical evidence." Mickles v. Shalala, 29 F.3d 918, 919 (4th Cir. 1994). Objective medical evidence of pain should be gathered and considered, but the absence of such evidence is not determinative. Hyatt v. Sullivan, 899 F.2d 329, 337 (4th Cir. 1990). A claimant's symptoms, including pain, are considered to diminish her capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical and other evidence.  20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4) (2006).  Additionally, the Regulations provide that:

[w]e will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your treating, examining, or consulting physician or psychologist, and observations by our employees and other persons.  . . .  Factors relevant to your symptoms, such as pain, which we will consider include:

> (I) Your daily activities;

> (ii) The location, duration, frequency, and intensity of your pain or other symptoms.

> (iii) Precipitating and aggravating factors;

> (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;

> (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;

> (vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 or 20 minutes every hour, sleeping on a board, etc.); and

> (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3) (2006).

SSR 96-7p repeats the two-step regulatory provisions:

> First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be

19

shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the individual's pain or other symptoms. * * * If there is no medically determinable physical or mental impairment(s), or if there is a medically determinable physical or mental impairment(s) but the impairment(s) could not reasonably be expected to produce the individual's pain or other symptoms, the symptoms cannot be found to affect the individual's ability to do basic work activities.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

SSR 96-7p, 1996 WL 374186 (July 2, 1996). SSR 96-7p specifically requires consideration of the "type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms" in assessing the credibility of an individual's statements. Significantly, SSR 96-7p requires the adjudicator to engage in the credibility assessment as early as step two in the sequential analysis; i.e., the ALJ must consider the impact of the symptoms on a claimant's ability to function along with the objective medical and other evidence in determining whether the claimant's impairment is "severe" within the meaning of the Regulations. A "severe" impairment is one which significantly limits the physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1520(c) and 416.920(c).

Craig and SSR 96-7p provide that although an ALJ may look for objective medical evidence of an underlying impairment capable of causing the type of pain alleged, the ALJ is not to reject a claimant's allegations solely because there is no objective medical evidence of the pain itself. Craig, 76 F.3d at 585, 594; SSR 96-7p ("the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record"). For example, the

20

allegations of a person who has a condition capable of causing pain may not be rejected simply because there is no evidence of "reduced joint motion, muscle spasms, deteriorating tissues [or] redness" to corroborate the extent of the pain. Id. at 595. Nevertheless,  Craig does not prevent an ALJ from considering the lack of objective evidence of the pain or the lack of other corroborating evidence as factors in his decision. The only analysis which Craig prohibits is one in which the ALJ rejects allegations of pain solely because the pain itself is not supported by objective medical evidence.

The ALJ noted the requirements of the applicable law and Regulations with regard to assessing pain, symptoms and credibility. (Tr. at 23-24.) Having resolved all doubts in Claimant's favor, the ALJ found, with regard to the threshold test, which is outlined above, that Claimant "produced evidence of an impairment that could reasonably be expected to cause the alleged symptoms." (Tr. at 23.) The ALJ therefore proceeded to consider the intensity and persistence of Claimant's alleged symptoms and the extent to which they affected Claimant's ability to work. (Tr. at 23-24.) The ALJ noted the requisite factors, and then analyzed them in the opinion, concluding that Claimant was partially credible regarding her alleged pain and that the "objective findings and medical treatment do not support her reported limitations to the degree alleged." (Tr. at 24.)

The undersigned finds that the ALJ properly considered the factors under 20 C.F.R. § 404.1529(c)(4), in evaluating Claimant's pain and credibility, despite Claimant's assertion to the contrary. The ALJ acknowledged Claimant's reports of constant aching, stabbing, burning, and stinging pain in her back and neck. (Tr. at 24.) He further acknowledged Claimant's reported limitations in lifting, standing, and sitting; her need to lie down on a heating pad; her reports of headaches; her inability to sleep due to pain, a lack of energy, and mental preoccupation; and her reports that sometimes the treatments, including pain medication, muscle relaxers, heating pads, and

21

topical medications, do not relieve her pain. (Id.)

The ALJ however, determined that "the objective findings and medical treatment do not support the claimant's reported disabling limitations." (Tr. at 24.) The ALJ noted that Claimant was advised by her treating physician, Dr. Saikali, to perform stretching exercises. (Tr. at 24, __.) However, Claimant reported that she did not perform the exercises because she was sore and stiff. (Id.) Claimant however, now alleges that she was unable to do the exercises because of the severe pain that she experienced. Despite Claimant's allegations of soreness and stiffness, Dr. Saikali, strongly encouraged her to do the exercises and that if she did not, she would not do well. (Tr. at 24, 203.) Furthermore, despite Claimant's alleged inability to perform the exercises due to pain and soreness, the medical evidence indicates that she essentially had normal ranges of motions of her joints, with no indication of muscle weakness or atrophy. (Tr. at 24, 348-50.)

The medical record reveals that Claimant was referred to Dr. Wassim Saikali, M.D., on November 6, 2001, for evaluation of multiple aches and pains. (Tr. at 214.) Dr. Saikali diagnosed Claimant as suffering from myofascial pain syndrome in the neck and shoulder area and polyarthralgias of the non-articular rheumatism variety. (Id.) He prescribed a muscle relaxer, Flexeril, and a pain reliever, Ultracet. (Id.) Claimant reported that Flexeril made her sleepy and Dr. Saikali advised that she take it before bedtime. (Id.) Dr. Saikali emphasized that Claimant should perform stretching exercises and indicated that trigger point injections would be considered on her next visit. (Id.) In December, 2001, Claimant reported continued complaints of fatigue and tiredness and indicated that she was under a lot of stress. (Tr. at 213.) On exam, Dr. Saikali noted mild tenderness in the trapezia, nuchal area and noted that she "looks depressed." (Id.) He diagnosed non-articular rheumatism; continued her medications, as they helped her some; and prescribed Salsalate 750mg. (Id.) On February 22, 2002, Claimant reported that the Ultracet had helped some but that she had

generalized aches and pains, associated with stiffness and soreness. (Id.) She further complained of back pain associated with stiffness, which was worse with prolonged sitting. (Id.) However, Claimant did not report any numbness or tingling. (Id.) Dr. Saikali diagnosed low back pain, lumbago, and lumbosacral sprain; continued her medications; and prescribed Effexor for her depression. (Id.)

Dr. Saikali noted on April 22, 2002, that Claimant continued to work but opined that most likely suffered from early fibromyalgia and depression. (Tr. at 212.) He again emphasized that she should perform stretching exercises. (Id.) In July, 2002, Claimant presented with tenderness in the trapezia, nuchal area and decreased flexion of the lumbar spine. (Tr. at 211.) Dr. Saikali diagnosed fibromyalgia and depression, and advised Claimant to perform stretching exercises. (Id.) On October 29, 2002, Claimant reported moderate pain in her upper and lower back, associated with stiffness and which was worse with bending. (Tr. at 210.) Dr. Saikali diagnosed lumbago and lumbosacral sprain, advised Claimant to perform stretching exercises, prescribed Skelaxin 40mg, and increased Neurontin to 400mg. (Id.) Four months later, Claimant continued to complaint of back pain and discomfort, which was worse on standing for a long time. (Tr. at 209.)

On February 21, 2003, Dr. Saikali gave Claimant one month off work, as she was unable to function. (Tr. at 208.) However, he believed that there was room for improvement and advised her to start doing stretching exercises. (Id.) Dr. Saikali therefore opined: "I don't believe she is permanently disabled at this time." (Id.) He prescribed Zyprexa due to her mood disorder and lack of improvement. (Id.) On March 10, 2003, Claimant presented as a walk-in patient and complained that she was unable to function due to pain and discomfort in her neck and shoulder. (Id.) She reported that Zyprexa may have helped but that it made her sleepy and unable to function. (Id.) Dr. Saikali opined that Claimant was unable "to function for at least the next 6 to 9 months." (Id.) On April 21, 2003, Dr. Saikali again opined that Claimant was "probably disabled for the next 4 to 6

23

months," but noted that if she improved, the scenario would be different. (Tr. at 207.)

Claimant reported on June 23, 2003, difficulty remembering things and poor concentration. (Tr. at 206.) She further reported that Dr. Hasan advised that she was not disabled due to depression. (Id.) Dr. Saikali diagnosed fibromyalgia and noted that she should be aggressively treated for depression, as it was rendering pain management more challenging in that Claimant was not responding to any medication. (Id.) He advised Claimant to perform exercises and try job modification "because most likely she is going to be denied disability based on the findings." (Id.) On August 22, 2003, Claimant reported continued memory problems and indicated that Bextra made her feel very stiff and sore. (Id.) She complained of joint pain and discomfort in the hands, neck, and back with associated stiffness. (Id.) On October 22, 2003, Claimant complained of headaches, which Dr. Saikali thought was due to tension or resulted from the Bextra. (Tr. at 205.) On December 22, 2003, Dr. Saikali noted that the headaches could be tension related or was induced by the Celexa and Wellbutrin. (Tr. at 204.) On February 23, 2004, Claimant reported that she was tired, fatigued, and not motivated. (Tr. at 203.) She reported that she was not doing any exercises because she was sore and stiff after the EMG nerve conduction study for two to three days. (Id.) Dr. Saikali diagnosed fibromyalgia as her primary problem but opined that Claimant would not "do well if she does not do exercises." (Id.)

Dr. Rodolfo Gobunsuy, M.D., conducted a consultative evaluation of Claimant on September 15, 2004. (Tr. at 348-353.) Dr. Gobunsuy noted Claimant's reports that her pain started in the lower back and then spread to her spine, which caused headaches, and then down to her arms and legs. (Tr. at 348.) She reported that her muscles were achy with spasm and stiffness, that she could not sleep due to pain and mental preoccupation, and that she was tired during the day with little energy. (Id.) On physical exam, she presented with a steady gait and had no difficulty arising from a sitting

24

position. (Tr. at 349.) On neurological exam, Dr. Gobunsuy observed no muscle weakness or atrophy, noted that sensation was normal to light touch and pin-prick, and that her intellectual functioning and mental status appeared normal during the exam. (Tr. at 350.) Claimant was able to walk on her heels and toes and could walk heel-to-toe and squat, but with difficulty. (Id.) She presented with tenderness from the cervical spine to the mid-sacral area without paralumbar muscle spasm. (Id.) her shoulders were tender, as were her elbows, wrists, and hands. (Id.) Dr. Gobunsuy opined that Claimant had the trigger points of fibromyalgia but noted that she walked steadily and that the range of motion of her joints and lower back was satisfactory. (Id.)

The state agency physicians, Dr. James Egnor, M.D., and Dr. Marcel Lambrechts, M.D., opined that Claimant was capable of performing light exertional level work with occasional postural limitations and limitations that she avoid concentrated exposure to extreme cold and vibration due to pain. (Tr. at 166-74, 260-68.)

The ALJ further found that the evidence of record did not establish that Claimant's "medications would interfere with the jobs identified by the vocational expert." (Tr. at 24.) Claimant alleges however, that her medications result in "multiple side effects," such as sleepiness, dizziness, and feeling of being confused. (Doc. No. 15 at 11.) Claimant reported in a form Personal Pain Questionnaire dated February 10, 2004, that her medications, namely Bextra, Darvocet, and Flexeril, resulted in "stomach upset, constipation, [and] dizziness at times." (Tr. at 110.) The medical evidence of record reflects non-specific assertions of sleepiness with some medication, but that most of her medications were changed if she reported a significant side effect. Furthermore, despite Claimant's alleged side effects, there is no indication in the record as a whole, that the side effects caused significant limitations in her ability to function. The ALJ restricted Claimant from performing work which required her exposure to machinery or heights, and precluded her from climbing ladders, ropes,

25

and scaffolds. (Tr. at 24.) Accordingly, the Court finds that Claimant's alleged significant side effects from her medications are not supported by the evidence of record. To the extent that her alleged side effects are documented, the Court finds that the ALJ accommodated them in assessing her RFC.

The ALJ further considered the additional factors in the Regulations, finding that Claimant greatly minimized her activities of daily living, and that despite her fatigue and pain resulting from her fibromyalgia, these symptoms "would not increase her problems beyond her residual functional capacity." (Tr. at 24.) The ALJ's pain and credibility assessment therefore, is supported by substantial evidence.

**3. RFC Assessment.**

Third, Claimant alleges that the ALJ erred in assessing her RFC. (Doc. No. 15 at 11-12.) Specifically, she asserts that the she is unable to function due to pain, that her husband must "carefully monitor her activities and medications due to her inability to function," and that her level of social functioning was not an acceptable level of functioning. (Id.) The Commissioner asserts that Claimant did not have moderate limitations in social functioning and that substantial evidence supports the ALJ's RFC assessment. (Doc. No. 16 at 15-17.)

The RFC determination is an issue reserved to the Commissioner. See 20 C.F.R. §§ 404.1527(e)(2); 416.927(e)(2)(2006).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physicians' opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted). Although medical source opinions are considered in evaluating an individual's residual functional capacity, the final responsibility for determining a claimant's RFC is reserved to the Commissioner. See 20 C.F.R. §

404.1527(e)(2) (2006). In determining disability, the ALJ must consider the medical source opinions "together with the rest of the relevant evidence we receive." Id. § 404.1527(b).

As stated above, the ALJ, after considering all evidence of record, determined that Claimant retained the RFC for sedentary or light exertional level work, with some physical limitations. At steps two and three of the special technique, the ALJ found that Claimant's ability to perform activities of daily living and maintain social functioning and concentration, persistence, and pace were mildly limited by her mental impairments. (Tr. at 21.) In reaching this conclusion, the ALJ, as discussed above, rejected the opinions of the state agency psychological consultants, Drs. Lilly and Binder, as well as the psychological evaluation of Ms. Caudell. (Id.) On December 13, 2003, Debra L. Lilly, Ph.D., opined that Claimant's depressive and anxiety disorders mildly limited her activities of daily living; moderately limited her ability to maintain social functioning and concentration, persistence, or pace; and resulted in no episodes of decompensation. (Tr. at 21, 198.) However, Dr. Lilly noted that Claimant was only moderately limited in her ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and interact appropriately with the general public. (Tr. at 183-84.) On March 15, 2006, James Binder, M.D., assessed the same limitations as did Dr. Lilly, with the addition of moderate limitations in the ability to complete a normal workday or workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, and to accept instructions and respond appropriately to criticism from supervisors. (Tr. at 21, 275-76, 290.) As the Commissioner notes, the moderate limitations regarding the general public do not concern a basic mental activity required for work under the Regulations. See 20 C.F.R. § 404.1521(b) (2006). Accordingly, the assessments of Drs. Lilly and Binder essentially were

27

equivalent to the ALJ's findings to the extent that he found mild limitations in social functioning.

The record indicates that on November 13, 2003, Dale M. Rice, M.A., a Licensed Psychologist, and Kimberly D. Caudell, M.A., a Supervised Psychologist, conducted a psychological evaluation of Claimant and opined that Claimant's social functioning, persistence, and pace were moderately limited. (Tr. at 21, 180.) However, as the ALJ found, Claimant's reported activities involving social functioning do not support such moderate limitations. Claimant reported that she visited with family; that family, friends, and neighbors occasionally took her places; that she goes shopping for one or two hours each week; that she received visitors once every two to four weeks; and that she attends her doctor appointments. (Tr. at 21, 104-105.) Though Claimant alleges that these activities are not indicative of "an exceptional level of social activity," the Court finds that they are consistent with the mild limitations assessed by the ALJ. The Court has addressed Claimant's remaining allegations above. Accordingly, based on the foregoing, the Court finds that the ALJ's RFC assessment is supported by substantial evidence of record.

**4. <u>VE Testimony.</u>**

Finally, Claimant alleges that the ALJ misconstrued the testimony of the VE and erred in rejecting the limitations regarding Claimant's ability to concentrate and sleep. (Doc. No. 15 at 12) Claimant asserts that the VE testified that there were no jobs which Claimant could perform when considering these limitations. (<u>Id.</u>) The Commissioner asserts that on psychological testing, Claimant was able to perform serial sevens, spell the word "WORLD" forward and backward, and therefore, demonstrated normal concentration. (Doc. No. 16 at 18.) Furthermore, the Commissioner asserts that the record does not support limitations on Claimant's memory. (<u>Id.</u>)

To be relevant or helpful, a vocational expert's opinion must be based upon consideration of all evidence of record, and it must be in response to a hypothetical question which fairly sets out all

of the claimant's impairments. <u>Walker v. Bowen</u>, 889 F.2d 47, 51 (4th Cir. 1989). "[I]t is difficult to see how a vocational expert can be of any assistance if he is not familiar with the particular claimant's impairments and abilities – presumably, he must study the evidence of record to reach the necessary level of familiarity." <u>Id.</u> at 51. Nevertheless, while questions posed to the vocational expert must fairly set out all of claimant's impairments, the questions need only reflect those impairments that are supported by the record. <u>See</u> <u>Chrupcala v. Heckler</u>, 829 F.2d 1269, 1276 (3d Cir. 1987). Additionally, the hypothetical question may omit non-severe impairments, but must include those which the ALJ finds to be severe. <u>See</u> <u>Benenate v. Schweiker</u>, 719 F.2d 291, 292 (8th Cir. 1983).

In his hypothetical questions to the VE, the ALJ included all of Claimant's impairments that were supported by the record. (Tr. at 645-62.) However, on questioning from Claimant's attorney, the VE testified that if concentration was limited to the point where the claimant could not focus on the task at hand and complete it, then she would be unable to perform any of the identified jobs. (Tr. at 653.) Regarding memory, the VE further testified that if the hypothetical claimant's problems with memory affected her ability to complete a simple one or two step job task, then there would be no work which she could perform. (Tr. at 653.) The evidence of record however, does not support the severity of Claimant's alleged concentration and memory problems. Mr. Rice and Ms. Caudell opined that Claimant's concentration and recent and remote memory were within normal limits, but that her immediate memory was mildly deficient. (Tr. at 178.) Claimant's treating psychiatrist, Dr. Hasan, noted that Claimant was able to subtract thirty three cents from one dollar, was able to do serial sevens, and was able to spell the word "WORLD" backward and forward. (Tr. at 252.)

Based on these examinations, the Court finds that substantial evidence supports the ALJ's finding that Claimant's concentration was mildly limited. The record does not support the severity of the limitations in concentration and memory as counsel posed in his hypothetical to the VE.

29

Claimant does not otherwise challenge the ALJ's hypothetical questions to the VE, and therefore, the ALJ properly relied on the VE's responses. Accordingly, the Court finds that substantial evidence supports the ALJ's decision.

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision is supported by substantial evidence. Accordingly, by Judgment Order entered this day, the Plaintiff's Motion for Judgment on the Pleadings (Doc. No. 15.) is **DENIED**, Defendant's Motion for Judgment on the Pleadings (Doc. No. 16.) is **GRANTED**, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to send a copy of this Memorandum Opinion to counsel of record.

ENTER: March 31, 2008.

R. Clarke VanDervort
United States Magistrate Judge

30